Good morning, Your Honors. May it please the Court, my name is Christian Boyles and I represent Umpqua Valley Audubon Society in this petition for review. I'd like to save three minutes of my time this morning for rebuttal. I will address three Forest Service failings this morning. First, the Forest Service's failure to comply with its substantive duties under the Northwest Forest Plan's Aquatic Conservation Strategy. Second, its failure to comply with the National Environmental Policy Act. And third, its removal of the opportunity to administratively appeal its decisions. Finally, if there's time, I will touch briefly on the FERC jurisdictional argument. Let me briefly remind the Court of how we are here today challenging Forest Service failures in a direct petition for review under the Federal Power Act. As this Court has held in California Save Our Streams, we must challenge the final license issued by FERC, even if the challenge focuses on the failures of another agency within the licensing process. Because the North Umpqua Hydropower Project is on Forest Service land, the Forest Service must determine mandatory terms and conditions to protect that land and its resources under Section 4E of the Federal Power Act. Turning to my first point, the Forest Service failed to meet its legal duties under the Northwest Forest Plan's Aquatic Conservation Strategy when it issued its 4E terms and conditions. The Aquatic Conservation Strategy establishes binding standards and guidelines for the Forest Service. For us here talking about a hydropower project, the standards at issue LH1, 2, and 3 require that the Forest Service focus on in-stream flow needs, habitat conditions, riparian protection, and fish passage. LH3 specifically mandates that the Forest Service provide recommendations to FERC that ensure Aquatic Conservation Strategy objectives are met. In turn, the nine Aquatic Conservation Strategy objectives call for maintaining and maintaining aquatic, riparian reserves, the sediment regime, water quality, habitat complexity. One of the four components of the Aquatic Conservation Strategy is watershed analysis. And a watershed analysis is to be the mechanism to ensure that the Aquatic Conservation Strategy objectives are met. Watershed analysis shapes the projects to meet those standards, and they become a vital part of the management scheme. Are you talking about the removal of the dam? That if only they would remove the dam, the fish could go back and forth a lot better? That's certainly true, Your Honor, if we were just talking about fish passage. And let me address that specifically. Clearly, the Forest Service did require changes in the function of Soda Springs Dam so that we could have fish passage. They're talking about allowing limited fish passage both upstream and downstream. But the Aquatic Conservation Strategy requires much more than fish passage alone. It requires the Forest Service to take a broad look at this entire watershed. And when the settlement agreement and the four E terms and conditions focused only on fish passage, they missed the other parts of the Aquatic Conservation Strategy that they're required to look at. For example, there is prime, rare and unique, says the watershed analysis, spawning habitat that is inundated, that is drowned by Soda Springs Reservoir. That is not addressed by a fish passage option. The downstream movement of natural materials that you need for fish habitat, sediment and large wood to create those places that fish need to hide and rest and feed, that does not occur with allowing only a fish passage. The idea that there are warm water fish now in the reservoir that will eat the young salmon as they go through the now, when they finally get fish passage, that's not addressed either. All of those things are issues that the Forest Service must look at, is required to consider under its Aquatic Conservation Strategy legal mandate, and did not. And we know that because of the evidence in the record. And the evidence in this record shows that the Forest Service just looked and got a singular focus on fish passage and then decided that that was going to be enough. This is remarkable because the Forest Service was initially such a strong advocate for dam removal, for removal of Soda Springs Dam. And let me remind the Court we're talking about the last dam of eight. It's not one dam at a time. The entire project consists of the eight dams on the upper North Umpqua River. The record compiles that best science from the Forest Service itself and from outside scientists. There are two watershed analysis. And again, these are the documents and the mechanism in the Aquatic Conservation Strategy to protect and restore the watershed. They have the scientific information that support removing Soda Springs Dam to benefit all the river functions, not just fish passage, and to protect the downstream wild and scenic portion of the North Umpqua River. I think it's clear, and actually the Forest Service didn't dispute that it did identify at one time the removal of Soda Springs Dam as one management alternative, and even the best, actually. But it said that it goes on to say, and I want to know your response to this, that ultimately it concluded that fish passage with other operational measures was in fact more beneficial than the dam removal. And with respect, Your Honor, the Forest Service has nothing to back that up. That is a conclusory statement which doesn't have the scientific support in the record. Because the watershed analysis, which is the best science that has been put together by all of the people who are involved, the hydrologists, the biologists, the geologists, looking at a broad cumulative view of this watershed, said that those other options, which the Forest Service finally went with, were not as good and were not going to do as much, and in fact would not meet the aquatic conservation strategy goals. The other evidence in the record are, of course, the Forest Service reports leading up to the decision to enter into the settlement agreement. These are by Forest Service scientists, people within the agency, stating very clearly that none of the other options meet the aquatic conservation strategy objectives, and in fact fail to prevent, I mean, not fail, they prevent attainment of those objectives if you go with that route. So it's looking at those particular documents in the record that we need to judge what the Forest Service decided to do. And as you said, the Forest Service was advocating, when it came right down to the settlement agreement, they changed their minds. And perhaps if we had the evidence in the record to support that change, we would not be here today. But we don't have the evidence in the record. And the documents that the Forest Service points to, to shore up their position, cannot bear that weight. There is a March 1999 critique of the watershed analysis. It is an admittedly cursory review, was completed in only three weeks by a few Forest Service scientists, and only looked and critiqued the option of whether dam removal was a good idea, but did not look at all of the other options, compare them, contrast them, did not do any of that scientific review that the watershed analysis itself did. This is in sharp contrast to the watershed analysis, which did look at cumulative effects and water quality and geology and biology, and was prepared by scientists from private consulting firms, the state, the federal agencies, the tribal interests, and Pacificor itself. So the March 1999 critique cannot be held up against the findings of the watershed analysis. The other documents which the Forest Service points to, such as the consistency determination or the justification statements, they don't contain the scientific analysis. And in fact, the Forest Service in its brief admits that those are not scientific documents. They point to other scientific documents. But those other scientific documents we submit support our position, that in order to meet its legal responsibilities under the aquatic conservation strategy, the Forest Service had to do more than simply look at fish passage. Our second challenge is related, though it is procedural, and it's that the Forest Service failed to comply with the National Environmental Policy Act, or NEPA, in issuing its 4E terms and conditions. And it has been the Forest Service's longstanding practice either to prepare an environmental impact statement for its 4E terms and conditions or to tier the FERC's environmental impact statement. But neither happened here for two reasons. First, throughout most of the process, FERC and the Forest Service planned to jointly issue the environmental impact statement. That changed when the Forest Service entered into the settlement agreement between Pacificor and the various Federal and State agencies. At that point in time, FERC wrote to the Forest Service and said it would now be a conflict of interest for you to be a joint preparer of our environmental impact statement, and no longer would they do that. And that's why this case is not controlled by LEFLEM, the case cited by the Forest Service. These are not an issue of a lead agency with a cooperating agency. These agencies had planned to go that route, but because of the settlement agreement, it was decided that they could not go that route. The second reason why they did no NEPA work was that there was an EIS prepared by FERC. There was an EIS prepared by FERC, Your Honor. And that EIS is missing several things that you would have had if you had a Forest Service EIS on its 4E terms and conditions or if you had a Forest Service jointly preparing it. And what it's missing is the Forest Service EIS. And that EIS is missing some of the things that FERC needed to do to comply with the Aquatic Conservation Strategy. In this petition for review, you haven't challenged the adequacy of FERC's EIS, have you? We have not, Your Honor, because FERC does not do what we need the Forest Service to do, which is compare different options and alternatives for meeting the Forest Service's duty. And obviously, it's obvious why FERC didn't do it. That's not FERC's job. It's not its role to comply with the Aquatic Conservation Strategy. And FERC must accept without question, under the Supreme Court's decision in Escondido, the Forest Service's 4E terms and conditions. So FERC did not second-guess those. FERC took them and did its EIS. What we would have if the Forest Service had done an environmental analysis would be looking at the impacts on the prime spawning habitat, which are now drowned under the reservoir. And the relationship of that 1.2 miles of habitat to the watershed as a whole. We don't have that in the EIS. You might also have a look at how the dam interrupts the downstream flow of sediment or large wood and what that means to the wild and scenic portion of the river. We don't have that in the EIS. You might also look at the impact of predation when you do provide fish passage over Soda if the fish are going to get eaten by warm water trout when they get over the dam. That analysis, that comparison of alternatives is not in the FERC EIS and would be useful to the public, I think to the Forest Service itself, and to this Court in reviewing its decisions. The other issue, of course, with the EIS is timing. The FERC EIS came out almost two years after the Forest Service had entered into the settlement agreement, which drove its terms and conditions. And because NEPA is supposed to help the agency come up with its decisions before it makes them, the fact that the FERC EIS comes afterwards means that it couldn't do anything to help the Forest Service in this instance because it came too late. It came afterwards. It is true, and I just want to not hide the fact that the FERC EIS talks about the dam out and the dam removal alternative. But again, as Judge Thompson was indicating earlier, it only talks about it with respect to fish passage and not with these other broader duties that are embodied in the Aquatic Conservation Strategy, to look at the ecosystem and the watershed as a whole. Those are Forest Service duties. And in fact, I don't think we have any dispute between us and the Forest Service about whether they have those duties. The dispute is whether they've met those duties. Let me turn to my final point against the Forest Service. And it's a, it's a, there's a nesting issue here that I always have a hard time getting a handle on. But because the Forest Service did not issue a NEPA document, it did not issue a record of decision under its regulations. Because it did not issue a record of decision, there is no opportunity for an administrative appeal. And when the Forest Service issued its clarifying memo in May of 2003 that said it was no longer going to go through a NEPA process, it did not issue a record of decision under its regulations. It also said it was no longer going to allow administrative appeals of its 4E decisions, despite the fact that throughout this relicensing, it promised the administrative appeal opportunity. Yeah, now, how would you have been benefited had there been an ROD, record of decision, I think they were, then there would have been an administrative appeal possibility for you. Yes. You're here in this appeal before us. Obviously, we don't know as much about these things as perhaps the administrative appellate people would. Is that, and you've been denied that, is that the harm to you? You're still getting your appeal. You just get it to us. Right. I think there's two, I think there's two harms. The first harm is sort of the record, the development of the record on this issue. Administrative appeals, even if you do not prevail, are good for setting forth the documents that the agency relies on, the scientists that's going into this decision for really setting out the issues. And when you're talking about something as complicated and controversial as removal of one of the dams in this project, I think we would all have benefited from that regular administrative appeal. What we have now is we have the documents in the FERC record, but because the FERC record is about a larger issue of the entire project, you don't have that focus and that focus that you would get in an administrative appeal for that record. So what compelled the Forest Service to refrain from changing its prior practice? What compelled the Forest Service to refrain? Yeah. I think, Your Honor, that it was arbitrary and capricious for them to change it without explanation, and their explanation doesn't hold up, because the explanation they give in that May 2003 clarifying memo was that we no longer, we don't want to do it anymore, and other agencies don't have administrative appeal processes, which is incorrect. Agencies are now adding administrative appeal processes. Now but not then. Now but not then. But they are going. It was correct when they said it. It was correct when they were saying it. But additionally, I think that if they were going to change such a fundamental right as an appeal right in this instance, they would have had to have gone through notice and comment. And they did not do that. But I think that the What case, what's your best case that says that to be the situation? The best case is cited in our briefs, and it's the Bureau of, I'll get the cite for you, Your Honor. It's the Bureau of Immigration case. We discussed it at length in our reply brief. It talks about when there is a binding norm established that changes what used to happen, that takes away the discretion from a deciding agency official, that that is, in fact, a substantive rule. Even if, perhaps in a different situation, there's no regulation that requires it is a policy. We admit that it's a policy. They can change their mind. I just think they needed to go through the notice and comment procedures in order to do that, to really get a sense of what they were affecting as a public right. The other reason, Judge Thompson, that I think it makes a difference is I think in this case, if we had had the administrative appeal, you might have come up with a different decision. The record and the facts on this are that the Forest Service was going one way, and the scientists were pointing toward asking for dam removal. One of the removal of one of those dams. And then at the last minute, things changed with very little explanation. An administrative appeal, an appeal to a higher part of the Forest Service might have changed that. They might have looked at the evidence anew. It might have gotten it out of the basin and into a different decision maker. We don't know that. But especially where you have such an abrupt switch in position, without explanation, it would have benefited, I think, us all. I think I will save my comments about the jurisdictional argument for rebuttal. Thank you. May it please the Court. I'm Lisa Jones from the Department of Justice for the United States Forest Service. With me at council table is Carol Banta from the Federal Energy Regulatory Commission. And unless the Court has questions for her on any FERC matter, I would use the time that we had planned to split. But she is available if you do have questions. And I will take 13 minutes, and the project licensee, represented by Michael Schweiger here at the council table as well, Pacific Corp., they will take seven minutes. I will watch the clock and try to make sure I sit down quickly. It's kind of a shame that the petitioners decided to wait until rebuttal to talk about jurisdiction, because I think that there are some real procedural oddities in this case. There are certainly a couple of claims that are properly before the Court under the Federal Power Act. They can challenge the reasonableness of the Forest Service's 4E terms and conditions. They can challenge the reasonableness of the Forest Service's decision to adopt FERC's environmental impact statement rather than preparing a separate NEPA document. That's clear, and we've made that clear. However, they cannot bring a facial challenge, and what Ms. Boyle said this morning makes clear that their challenge to the May 2003 policy statement, their request that notice and comment be ordered by this Court within a FERC relicensing proceeding. Their request that this Court find that the Forest Service's policy was issued without explanation. Those are facial challenges to the 2003 policy, and there is just no jurisdiction under the Federal Power Act, which is what provides the exclusive court of appeals jurisdiction here, to hear those claims. Another procedural oddity here is that in this instance ---- Let's talk about that a second, though. Is there any forum available for them to challenge that Forest Service decision? Yes. First of all, here, they didn't ask for an administrative appeal. I'll talk about administrative appeal first. They didn't ask, so it's kind of unusual to come and complain to you and say, oh, it was futile. Well, even under normal ---- You didn't issue ---- I mean, the Forest Service didn't issue a rod, so what are they appealing? They're appealing ---- What are they appealing in their administrative appeal if there was no ---- The Forest Service did issue final four Es and had a letter saying we're going to adopt FERC's EIS, said do you want to submit further comments. They could have petitioned the Forest Service for an administrative appeal. They could have said to them, you've been saying all along you were going to issue a rod. You didn't. We'd like an administrative appeal anyway, and that's what I would have done if I had been in those circumstances. Appeal the failure to issue a rod? That would be cognizable? If they had asked, what would be cognizable is this. If they went to the Forest Service and said, we want an administrative appeal, petition the Forest Service for an administrative appeal. The Forest Service says no, and here's why. Take that to district court and challenge it. Or they could go to the Forest Service and say, petition them to conduct a notice and comment rulemaking. If they honestly believe there should have been notice and comment, there is a provision under the APA. Ask the agency to conduct a rulemaking. But is that really where we want to end up here? In other words, this is one place where a collateral attack is okay. Usually, if you collaterally attack something, that's bad. But here, it's generally referred to as a collateral attack to come to a FERC appeal to the court of appeals and challenge something internal, like a 4E. Well, that's why I think the as-applied challenge, the reasonableness of the 4Es, the Forest Service's compliance with NEPA, those types of collateral attacks are okay. But the types of collateral attacks that are not are things that don't have anything to do with, that you couldn't, under the Federal Power Act, you can affirm, vacate, or modify a FERC order. And there's nothing under the language of the jurisdictional provision that would permit you to order notice and comment rulemaking, declare. But let's say that your idea of an administrative appeal is followed, and they go to the Forest Service, and the Forest Service doesn't do right by them, and then they go to district court. Aren't you then starting to pick away at one of the cornerstones of what we have ruled on? Well, let me step back. I guess if they were bringing an as-applied challenge, like here, we didn't get an administrative appeal, and we think it might have changed things. I have plenty to say about why it wouldn't have made a difference, because of all of the input throughout this record. If you look at this record, there was such back and forth between the Forest Service and petitioners, there really isn't a problem. But as a facial matter, the notice and comment rulemaking, the declaration regarding the policy, those things, as a prudential matter, should be decided by district court on a record that the Forest Service responds to them, to those very requests. I mean, this is a very – this can only look at what the Forest Service did with respect to this licensing proceeding. So I guess what you're saying, then, that what she suggests would be futile. In other words, if you went to the district court after an administrative appeal in the Forest Service, that the district court could offer no relief that would mean anything in this case. The relief the district court could offer would be the general relief that they're seeking. When you read their opening brief, if they want notice and comment on this policy matter, they have six years under the APA to seek it. And if that's what they want, then they can get it. They can get an answer from – But it would not be project specific. It wouldn't – well, no, but I mean, notice and comment wouldn't be project specific anyway. That's just a general attack on the rule – I mean, not even the rule. It's a policy change. But, you know, they couldn't get that within this proceeding. But maybe I should just go ahead and turn to the NEPA compliance and the 4Es. But before I do, I just want to mention to the court that this was – FERC adopted a settlement agreement. And the settlement agreement had a number of different aspects to it, including the mandatory 4E conditions that were encompassed. There were also mandatory conditions by the other resource agencies, which are FERC. And none of those have been challenged. And FERC's own factual findings regarding the dam removal alternative versus not removing the dam alternative, FERC made specific findings. Those haven't been challenged here. So there is some redressability issue, which we pointed out in our brief. I'm not really sure if you have a problem with the 4E conditions that they've made for it to redress their injury. Because I would assume that they would say they're injured because the dam isn't being removed. But I'm going to go ahead and use the rest of my time to try to address the Northwest Forest Plan and the aquatic conservation strategy and what was actually required here. And the relevant standard and guide is LH2 for this particular project because the North Umpqua River is a non-key watershed. And the language there is during relicensing of hydroelectric projects, the Forest Service should provide written and timely license conditions to FERC that, I'm going to quote this, emphasize in-stream flows and habitat conditions that maintain or restore riparian resources and channel integrity. That's what the Forest Service should be doing in planning when hydroelectric projects are at issue. And here, with respect to the Soda Springs Dam, and that's the only aspect of this project that's at issue here, the Forest Service did identify during the administrative process four issues that could use some improvement with respect to the dam. One was there was no fish passage. The other, there was an inundated habitat. A third was it's very difficult for large woody debris like trees and things that provide good habitat for fish, and also for sediment to make it past the dam. And the fourth was brown trout predation issues. And respectfully, Ms. Boyles completely distorts the record and distorts the settlement agreement. There was not a singular focus on fish passage. Fish passage is provided both upstream and downstream. There is sediment movement, large woody debris passage, sediment enhancement projects, gravel augmentation, and there is a study. Right now, it makes sense to study whether or not it's true that there will be a brown trout predation problem. If there is, then the settlement agreement specifically provides for a predator control project. But because the fish ladders will be installed and haven't been yet, the proper course, I think it's appropriate, to see once the fish are making it up and down the dam if there actually is a problem. Where can we look in the record to find an explanation for the Forest Service saying that dam removal was the best choice to saying that these other measures were sufficient? Well, the aquatic conservation, I mean, excuse me, the North Umpqua watershed analysis, if you look at the watershed analysis, it also talks about non-dam removal and all sorts of other options. And I think it's somewhat obvious that when you have issues of fish passage, sediment, and large woody debris being stopped by a large structure, that if you take the dam out, those issues are most directly addressed. However, there is evidence in the record, and FERC noted this in its order, that if you remove the dam, there could be some issues with the amount of sediment that would then come down the river that could actually adversely impact the Wild and Scenic River Reach, which is below the Soda Springs Dam and in fact was designated as Wild and Scenic in 1988, some 40 years after the project was built. So, you know, something's going okay on the river here. And it was just, this is a reasoned agency decision-making process. Rather than saying, oh, the Forest Service was saying dam removal, dam removal, and then had an abrupt change in events, I would point the court to the supplemental excerpts of record at pages 42 to 52. The petitioners don't like this document and say it was quickly issued, but what that scientific review of the watershed analysis does is it points out, and it's a nice way for the court to see, where in the watershed analysis itself that the analysis pointed out the actual physical conditions of the river that we're talking about. That the pre-project conditions, which is not the baseline here, this court has held that you look at the project conditions as of the time of relicensing, not back in the 1940s. That's the American Rivers case. And this is somewhat of a backdoor attempt to get out from under that decision, I think, because they keep talking about pre-project. But when, in the watershed analysis, the Forest Service looked, and on this river there are some very narrow reaches, canyons, and the scientific analysis by the Forest Service said, you know, there wasn't historically a lot of sediment there. There wasn't historically a lot of large woody debris that would stay there because it was very narrow and there would be very high velocity flows coming through there and would push all of that through. And so those are the kind of things that the Forest Service pointed out. And that's in 1999. And I want to turn to the NEPA question because I'm running out of time. And I think I want to try to walk the court through a timeline here. The relicensing process began in 1995 and the Forest Service asked in February of 1995 to participate as a cooperating agency and did so for six and a half years during this relicensing process. Six and a half years during all the scoping, for ten months following FERC's beginning of its environmental review. And during that time, the Forest Service submitted preliminary terms and conditions, asked FERC to make sure that certain scientific studies were going to go forward, and presented comments, responsive comments to the petitioners whenever they commented. The Forest Service was there as a cooperating agency. You're running out of time. Why don't you just tell us the point of the timeline? Okay. So it was in July of 2001 when the cooperating agency, when FERC said, you can't cooperate with us any longer because FERC has somewhat unusual... FERC's NEPA implementing regulations do not permit ex parte communications. All right. We accept that, but you were going to use the timeline to illustrate nothing else. Okay. Anyway, even though the Forest Service was not a cooperating agency, the Forest Service continued to do just the things that the NEPA regulations point out that are important for a cooperating agency to do. And that is that 1501.6 sets out the responsibilities for a cooperating agency. And it's to participate in the NEPA process at the earliest time. Forest Service did that. Participate in scoping. Forest Service did that. Assume responsibility for developing information and preparing environmental analyses. Forest Service did that. So you're saying that even though they weren't officially a lead in a cooperating agency, they acted like they were. Exactly. And under this court's... Thank you, counsel. And I want you to know one other thing in La Flamme is here the Forest Service actually adopted FERC's EIS and made clear it was going to do that. And under the NEPA regulations, it's appropriate for another... Do I need to subtract that time? No, no, I'm sorry. Okay, then you should probably let them have their... Thank you. ...opportunity. Thank you. May it please the court, my name is Mike Swigert. I represent the licensee, Pacific Corps. Initially, Pacific Corps would reinforce that we believe that the FERC relicensing is not the appropriate forum to litigate the adequacy of internal Forest Service policies and procedures. And I actually think that there would be a remedy for this project if the petitioners had sought a collateral attack on the issue of NEPA and the administrative appeal. They could have asked FERC to stay the license while they pursued that collateral attack. In fact, that's what is done in other similar situations where, for example, a licensee or other party is challenging the conditions of a Clean Water Act certification under Section 401 in state court. They may go to FERC and ask FERC to stay the license while that collateral litigation is occurring. Isn't it a little more businesslike, though, to do it here? In other words, if what they want to say is that the Forest Service really couldn't do it this way as to this project, then they can bring that to us. We can decide it. But if you go the other route, then you've either got a stayed license or you've got a collateral attack that could theoretically undo the license down the road. But there's no record in the FERC proceeding on which you could even adjudicate the adequacy of their decision, you know, not to hold an administrative appeal or do an independent NEPA document. That record is somewhere with the Forest Service. It's not even part of this case. That's the problem, I think, we've got. On the merits, I guess I would like to focus on the fact that what we have here is a settlement agreement that is really a groundbreaking environmental-focused agreement. Pacificor is committing $7.4 million per year for decades for environmental enhancements, and as a result of early implementation, which is contemplated by the settlement agreement, Pacificor has already spent millions of dollars and is already producing environmental benefits. And the agreement takes an innovative watershed approach, acknowledging that restoration funds may be most effectively used in some cases off-site to achieve more environmental bang for the buck, as it were, than if all the money was put on on-site restorations. That's part of this agreement. Two fundamental arguments that the petitioners make against this. First of all, they say that off-site restoration fails to comply with the applicable Forest Service plans, in particular the ACS Guideline WR-3 that directs the Forest Service not to use "...mitigation or planned restoration as a substitute for preventing habitat degradation." Well, first, this clearly relates to new construction, not existing projects, because even dam removal would be a restoration, not a prevention here, so their arguments are logical. Secondly, they don't explain how a settlement agreement that commits $7.4 million a year to habitat improvements on an existing project is a degradation. Secondly, petitioners say only Forest Service actions that maximize environmental protections can comply with the Forest Service plans, and this dictates dam removal, but there's nothing in the Federal Power Act and 4E and certainly nothing in any of the Forest Service plans that they cite that says that environmental protection has to be maximized at all costs. In fact, the language of 4E says that the Forest Service submits conditions necessary to ensure the adequate protection and utilization of forest lands. Contrary to the Council for Petitioners, the FERC EIS looked at all the impacts of Soda Springs Dam. I have the FES right here. It's in the record. It goes through the whole litany of issues in terms of flows, fish passage, fluvial geomorphic processes, reservoir and forebay management mitigation, aquatic connectivity. The whole range of issues is presented and analyzed in the FEIS, and FERC came to the conclusion that the environmental benefits of the settlement agreement exceeded the environmental benefits of dam removal. The Forest Service agreed with that analysis in their Pacific Northwest Research Station report, and they disagreed with the watershed conservation conclusions on that question, so it's not at all clear that dam removal is the most environmentally preferred solution here. Finally, the petitioners claim that the Forest Service prejudged its 4Es because it signed the settlement agreement first and before the FERC's EIS is just plain wrong because the settlement agreement in Section 1.1.2 specifically provides that the final conditions may differ from the settlement agreement, and then other provisions of the settlement agreement say what the procedures the parties will go through if that event occurs, so there was clearly contemplated that the Forest Service would go through NEPA or review a NEPA document and then make their final 4E conditions. The Forest Service submitted its final 4Es in July 2003, and that was four months after the FEIS, in March 2003. So the Forest Service had the benefit of FERC's NEPA analysis, including its analysis of dam removal when it issued the final 4Es. If you have no questions, I'm done. Thank you, counsel. Judge Nelson, the case site that I wanted to provide you from earlier was Barahoma Gomez v. Reno that's cited on page 28 and 29 of our reply brief. We are here bringing an as-applied challenge to this license, and I think the question presented by the sort of issues being discussed by Forest Service counsel is boiled down to if we want to challenge the deprivation here of an appeal right in this instance or the fact that they didn't do NEPA, is this the time or place or not? And that's the question that's before this Court. We believe the case law from this Circuit, from the D.C. Circuit, and there are two Wisconsin cases, one from 2001, one from 2004, which clearly say that all issues come before the Court of Appeals in the first instance under the exclusive jurisdiction provisions of the Federal Power Act. We want an administrative appeal opportunity. We want NEPA here. We would – it is, I think, silly to say that we had to ask for an administrative appeal after the Forest Service issued an official memorandum saying we are no longer allowing administrative appeals of 4E terms and conditions. I want to think about the substance here and how it would be helpful to think about what the Aquatic Conservation Strategy objectives are and how fish passage alone doesn't get there, but if you had looked at what the watershed analysis looked at, you would come, perhaps, to different results. If you look at the healthy, prime and rare and unique spawning habitat that is inundated by the reservoir, you would see that that issue is not addressed by the EIS that we're talking about or by the settlement agreement, and you would have ended up with perhaps a different look that would be important when you talk about there's no comparable habitat in this area that's important for the watershed as a whole. Judge Wardlaw, you asked about specific record sites. I would urge the Court to look at Administrative Record 132, pages 70 through 71, ER 271, 122 to 151, and ER 372, 537 to 547. These are Forest Service documents. These are the documents that say the option that complies with the Aquatic Conservation Strategy is not simply providing fish passage at Soda Springs Dam. We are not saying that it would be impossible for the Forest Service to come to the conclusion that it did, that perhaps dam removal wasn't the only option, but under this record and under this science that is, in fact, the only option that was before the agency. And one factual error, the Forest Service did not adopt FERC's EIS. They issued their memorandum saying they were no longer going to do NEPA compliance and never did do any NEPA compliance. Thank you. All right. Thank you, Counsel. Unpub Valley v. FERC will be submitted and the Court will adjourn for this session.
judges: Thompson, T. Nelson, Wardlaw